***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner Holmes.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before Deputy Commissioner Holmes as:
 STIPULATIONS
1. That the date of the injury which is the subject of this claim is December 6, 2005. *Page 2 
2. That on such date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act;
3. That on such date, an Employer-Employee relationship existed between the Employee-Plaintiff and the Employer-Defendant;
4. That on such date, the Employer-Defendant employed three or more employees;
5. That Employer-Defendant is insured by Corvel;
6. The Plaintiff's average weekly wage is $1,144.47;
7. Defendant accepted Employee-Plaintiff's claim pursuant to a Form 60; and
8. Defendant has paid $704.00 weekly in temporary total disability.
 *********** ISSUES TO BE DETERMINED
1. Is Plaintiff totally and permanently disabled according to the Workers' Compensation Act?
2. Is Plaintiff entitled to attendant care?
 ***********
Based upon all of the competent, credible evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, Plaintiff was sixty-four (64) years old. Plaintiff holds a bachelor's degree in elementary education and English and a master's degree in education.
2. Plaintiff worked for Defendant-Employer for thirty-five (35) years as a teacher. During Plaintiff's last two years of employment with Defendant-Employer, she worked as a *Page 3 
special education teacher in its Gateway School in Greensboro, North Carolina. In that capacity, Plaintiff worked in two classrooms with a total of approximately ten non-verbal, non-ambulatory students. In addition to Plaintiff, the two classrooms were staffed by one other teacher, two assistant teachers, and one registered nurse.
3. In 2001, Plaintiff underwent a total knee replacement on her right knee due to osteoarthritis unrelated to her work. Plaintiff returned to full duty work as a Learning Disabled Resource Teacher following her right total knee replacement. Plaintiff was able to sit or stand in this position.
4. On December 6, 2005, Plaintiff slipped and fell in the parking lot on her way into the school, landing on her buttocks and left side. Defendant accepted this claim via a Form 60 filed on December 19, 2005.
5. Plaintiff initially treated with Occumed Walk In and Urgent Care where she was diagnosed with a cervical strain and contusions to the left hip and left knee. It was also noted that Plaintiff had osteoarthritis. An X-ray of Plaintiff's left knee taken on December 29, 2005 showed advanced osteoarthritic changes. On December 29, 2005, Plaintiff was released to return to work on December 30, 2005 with no restrictions.
6. Thereafter, Plaintiff was authorized to treat with Dr. John Rendall, an orthopaedic surgeon. Plaintiff first presented to Dr. Rendall on January 3, 2006 with a primary complaint of left knee pain. Plaintiff informed Dr. Rendell that her left knee had been bothering her since 2001. Dr. Rendell diagnosed Plaintiff with arthritis with unremitting pain in her left knee. He opined Plaintiff's left knee cartilage had worn down over time and that her December 6, 2005 fall, "seemed to be the last straw." Plaintiff was given a cortisone injection and was instructed to return in one week. *Page 4 
7. On April 11, 2006, Dr. Rendall recommended that Plaintiff undergo a total left knee replacement. Plaintiff underwent the recommended surgery on June 21, 2006, following the conclusion of the school year. After her surgery, Plaintiff participated in physical therapy and a home exercise program, and was prescribed pain medication.
8. On October 31, 2006, Dr. Rendall noted that Plaintiff had moderate discomfort around the kneecap but that her knee was functioning well. Also on October 31, 2006, Dr. Rendall indicated that Plaintiff "will clearly be unable to return to full duties of special education teacher which includes lifting 30-100 lbs. children multiple times during the day." He further suggested that Plaintiff should "probably go to medical retirement," if her only choice was to return to her previous job description. In making these statements, Dr. Rendall relied solely on Plaintiff's description of her job duties, and was not aware that there were other teachers and assistant teachers in Plaintiff's class room. Dr. Rendall indicated that he would not have objected to Plaintiff returning to teaching in a primarily sedentary position as of 2006. Dr. Rendall was not, however, certain whether Plaintiff could teach as of the time of the deposition, even in a position which allowed to her remain primarily seated. The reason Dr. Rendall gave for this opinion was that Plaintiff had become deconditioned for four years following her accident as the result of not working.
9. A functional capacity evaluation (FCE) was completed on November 28, 2006. Although Plaintiff was unable to lift any weight while performing a barrier lift, back lift, leg lift, or power lift, the results of the FCE indicated that Plaintiff could work at a sedentary-light physical demand level for eight (8) hours per day.
10. Plaintiff last saw Dr. Rendall on February 4, 2010. Plaintiff informed Dr. Rendall that she requested the appointment because she needed to "refresh her status" with him. Plaintiff *Page 5 
did not indicate that she was experiencing any pain at that time. Dr. Rendall gave Plaintiff a thirty percent (30%) rating to her left knee.
11. Plaintiff testified that she spoke to her employer after having her knee replacement to determine if she would be able to return to teaching, and it was mutually decided that she would not be able to continue as a special education teacher. When asked whether she could perform the Learning Disabled Resource Teacher job that she performed following her total right knee replacement Plaintiff stated, "I suppose, but what has — what happens is the teaching and the standing on it, it becomes difficult for me." When asked whether she could stand or sit as needed in the Learning Disabled Resource Teacher position, Plaintiff responded, "At the time, we could." Later in her deposition, in response to a question from her attorney about whether she could perform the Learning Disabled Resource Teacher position in a full time capacity, Plaintiff stated, "I don't think — because what happened is, as teachers, we — you can only sit for so long because you are — as a teacher you're required to stand, so that's why sometimes I work with the students at the chalkboard or stood up and gave a group instruction so it was teaching, because you were told that even in LD resource, you're only supposed to sit for so long."
12. Plaintiff volunteered as a tutor at her church following her total left knee replacement. Plaintiff testified at the hearing before the Deputy Commissioner that she stopped her volunteer tutoring activities because her pain sometimes prevented her from attending tutoring sessions. However, Plaintiff informed Ms. Brooker that she stopped tutoring because she was concerned that she would not be at home to attend to her husband, who suffers from multiple sclerosis, in the case of an emergency. *Page 6 
13. On February 22, 2010, an initial vocational assessment was prepared by vocational rehabilitation consultant Monica Brooker. Plaintiff was referred to Ms. Brooker by her attorney. While Ms. Brooker testified that she was unable to find employment opportunities within Plaintiff's limitations that would pay what Plaintiff earned prior to the injury, she did identify five positions that Plaintiff was qualified for: information clerk, cashier, receptionist, social services aide, and tutor. Ms. Brooker concluded that Plaintiff was not qualified to return to teaching in a school based on her assertion that teaching is typically performed at the light physical demand level at minimum, and that a special education teaching position would perform work at higher than a light physical demand level. Ms. Brooker did not speak to a representative of Defendant-Employer regarding the possibility of Plaintiff returning to her job.
14. Plaintiff testified that she needed attendant care to help her get some of her housework done. Specifically, Plaintiff indicated that standing for long periods of time and negotiating the steps in her tri-level home had become a "real challenge." However, Plaintiff stated that she compensated for the difficulty with the steps by making sure that she had everything she needed with her when she was downstairs so that she did not have to go up and down.
15. Plaintiff was authorized to treat with her primary care physician, Dr. Annmarie Mazzocchi at Piedmont Family and Sports Medicine, to manage pain medications. Dr. Mazzocchi left the practice abruptly in 2009 and Dr. Martin Murphy was recruited to see patients until a replacement physician was hired. Dr. Murphy saw Plaintiff during one appointment which lasted approximately fifteen to twenty minutes. On November 20, 2009, Dr. Murphy completed and signed a letter from Plaintiff's counsel to Dr. Mazzocchi dated October 16, 2009 which posed several questions about Plaintiff's need for attendant care. In responding to the *Page 7 
questions, Dr. Murphy indicated that four hours a week of attendant care was reasonably necessary to provide Plaintiff relief, and that this would be necessary for the rest of Plaintiff's life. Dr. Murphy's response was based on Plaintiff's self-described limitations. Furthermore, when asked with respect to Plaintiff, "Is attendant care something that you recommended for her, is this something that you came up with for her?" Dr. Murphy responded, "No. That was her specific reason for coming in and talking to me."
16. When asked for his opinion regarding the October 16, 2009 letter, Dr. Rendall indicated, "It would probably not be inappropriate to have somebody helping her around her house for four hours a week." However, when asked, "Did you come up with attendant care for Ms. Pitts?" Dr. Rendall stated, "No, that was never my idea." He further stated that he did not prescribe attendant care for Plaintiff. Moreover, Dr. Rendall indicated that his opinion that it would not be inappropriate for Plaintiff to have attendant care to assist her with housework was based not only on the condition of Plaintiff's left knee, which is the subject of the instant claim, but also on the condition of her right knee, which was the subject of a non-work related surgical procedure, and her whole body.
17. The Full Commission finds, based on the greater weight of the evidence, that Plaintiff is capable of some work as evidenced by Dr. Rendall's testimony, the November 28, 2006 FCE, and Ms. Brooker's vocational assessment.
18. The Full Commission finds that there is insufficient medical evidence upon which to find by the greater weight that providing Plaintiff with housework services is medically necessary as the result of Plaintiff's compensable left knee condition.
 *********** *Page 8 
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On December 6, 2005, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with Defendant-Employer. As a result of the injury by accident, Plaintiff experienced a significant aggravation of her pre-existing left knee condition which accelerated her need for knee replacement surgery. N.C. Gen. Stat. § 97-2(6).
2. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). To support a conclusion of disability, the plaintiff must prove and the Industrial Commission must find that: (1) plaintiff was incapable after her injury of earning the same wages earned prior to injury in the same employment, (2) plaintiff was incapable after her injury of earning the same wages she earned prior to injury in any other employment, and (3) plaintiff's incapacity to earn wages was caused by her compensable injury. Hilliard,305 N.C. at 595, 290 S.E.2d at 683. Disability can be total or partial in nature, and it can be temporary or permanent in duration. N.C. Gen. Stat. §§ 97-29, 97-30, 97-31. Further, the question is whether plaintiff is incapable of work in any
employment. See Demery v. Perdue Farms,143 N.C. App. 259, 545 S.E.2d 485 (2001).
3. As Plaintiff is capable of some work, she has failed to prove that she is permanently and totally disabled as a result of her injury by accident of December 6, 2005, and is therefore not entitled to permanent total disability compensation. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to payment by Defendant of all medical expenses incurred or to be incurred as a result *Page 9 
of her compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, provide relief, or tend to lessen Plaintiff's period of disability.
5. Although the Workers' Compensation Act allows, in certain circumstances, for the payment of attendant care to a claimant as medical compensation, the facts of the present case as well as the nature of the services requested by Plaintiff do not support a finding or holding that Plaintiff is entitled to attendant care.Scarboro v. Emery WorldWide Freight Corp.,192 N.C. App. 488, 665 S.E.2d 781 (2008). Whereas extraordinary and unusual expenses are embraced in the "other treatment" language of N.C. Gen. Stat. § 97-25, ordinary necessities of life are to be paid from the statutory substitute for wages provided by the Workers' Compensation Act. Dereberry v. Pitt County FireMarshall, 318 N.C. 192, 347 S.E.2d 814 (1986);Timmons v. N.C. Dept. of Transportation,123 N.C. App. 456, 473 S.E.2d 356 (1996), aff'd per curiam,346 N.C. 173, 484 S.E.2d 551 (1997). In the instant case, the housework services requested by Plaintiff are not extraordinary and unusual expenses. Rather, they are ordinary expenses of life for Plaintiff, and therefore, are not payable by Defendant. N.C. Gen. Stat. §§ 97-25; 97-2(19); 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to Plaintiff ongoing temporary total disability compensation at the rate of $704.00 per week continuing until such time as she returns to work or until further order of the Commission. *Page 10 
2. Defendant shall pay for all medical treatment incurred or to be incurred as a result of Plaintiff's compensable injury by accident so long as said treatment effects a cure, provides relief, or tends to lessen Plaintiff's period of disability. Plaintiff is not entitled to attendant care as attendant care is not medically necessary as a result of Plaintiff's injury by accident.
3. Defendant shall pay costs, including expert witness fees for the three depositions taken after the hearing, if said fees have not been heretofore ordered paid by the Industrial Commission. Said fees to be paid are $575.00 to Dr. John Rendall, $400.00 to Dr. Martin Murphy and $185.00 to Monica J. Brooker.
This the 23rd day of December, 2010.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1